IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HATEM AYESH,                          )
                                      )
        Petitioner,              )
                                      )
vs.                                   )     Case No. 08 C 542
                                      )
U.S. IMMIGRATION AND                  )
CUSTOMS ENFORCEMENT, et al.,          )
                                      )
        Respondents.             )

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Hatem Ayesh has petitioned the Court for a writ of habeas corpus and for an injunction, declaratory relief, and a writ of mandamus. The Court conducted a bench trial on Ayesh's claims. This constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

### Ayesh's claims

In his petition, Ayesh alleges that he is a citizen of the United States and that U.S. Immigration and Customs Enforcement (ICE) wrongfully placed him in custody intending to deport him. The respondents deny that Ayesh is a U.S. citizen.

Ayesh alleges that entered the United States as a lawful permanent resident in 1982. In 1987, he applied to be naturalized as a U.S. citizen. Ayesh contends that he became a citizen on March 2, 1988. On March 23, 1988, he was convicted of criminal possession of marijuana, and in August 1989, he was convicted of a similar offense. In

December 1989, he was "paroled" by the former Immigration and Naturalization Service (INS) to determine his eligibility to remain in the United States. In August 2002, Ayesh was convicted of false use of a Social Security number.

According to Ayesh's petition, in October 2001, the Department of Homeland Security (DHS) issued him a notice to appear, alleging that he was not a U.S. citizen and was removable from this country due to his conviction of a crime (it is unclear from the record which criminal conviction(s) formed the basis of the notice to appear). Ayesh alleges that he was in ICE custody for several years and was then released. He alleges in his petition that he had argued to an immigration judge that he could not be removed because he is a U.S. citizen. The record does not disclose whether the judge ruled on that issue or why Ayesh was released from ICE custody.

Ayesh alleges in his petition that in 2004, he applied for and obtained a U.S. passport but that in March 2005, the State Department revoked his passport on the ground that he is not a U.S. citizen. At the time he filed this lawsuit, Ayesh alleged, removal proceedings were pending before an immigration judge. The Court notes that after Ayesh filed the present lawsuit, an immigration judge found Ayesh to be removable from this country, and the Board of Immigration Appeals denied his appeal. The latter ruling was issued shortly after the conclusion of the trial in the present case.

Ayesh contends in his petition that as a U.S. citizen, the Constitution forbids his deportation. In addition, he alleges that he filed, in 2006, an application for issuance of a new citizenship certificate, which U.S. Citizenship and Immigration Services (USCIS) had not adjudicated at the time he filed suit. Ayesh also contends that his passport was

improperly revoked without a hearing as required by federal regulations. He seeks an order declaring that he is a U.S. citizen; his constitutional rights were violated by placing him in removal proceedings; and the State Department violated the law in refusing to issue him a new passport.

**Facts**[1]

**1.  The naturalization application and approval process in 1988**

Ayesh applied for naturalization in 1988. The Court begins by reviewing the procedure and practice at that time concerning applications for naturalization.

A person wishing to be naturalized submits an application to file a petition for naturalization - a Form N-400 - and, if that is approved, submits a petition for naturalization - a Form N-405. The N-400 form contains a series of questions about the applicant and his background. The applicant must swear to the truth of the information he provides.

After filing an application for naturalization, the applicant is scheduled for an interview by am immigration officer. In 1988, immigration officers worked for the INS, which had its Chicago office in the Dirksen Federal Courthouse. The immigration officer would begin the interview by swearing in the applicant. The usual practice of immigration officers was to verbally ask the applicant every question in the application, to verify the accuracy of the applicant's written answers. During this process, the officer would take notes and make corrections directly on the application. The officer would

---

[1] The Court admits into evidence the supplemental exhibits that each side presented with its post-hearing brief.

also obtain the applicant's fingerprints and other required documentation. The officer would administer a civics examination (referred to by some witnesses at trial as a "government test") and would require the applicant to write one or more sentences in English.

During the interview – at least if it appeared the applicant was likely to qualify for naturalization – the immigration officer would, together with the applicant, fill out the petition for naturalization form (the N-405 form). The front side of the N-405 form contains spaces to insert identifying information, as well as preprinted statements affirming that the applicant met the requirements for naturalization, and a space for the applicant's signature. The lower right corner of the form contains a space for the officer to verify that the applicant had sworn to the truth of the petition.

At the conclusion of the interview – again, at least if it appeared the applicant would qualify for citizenship – the officer would review the petition with the applicant and ask the applicant to review and sign it. The officer would then sign the form and stamp on it the date of the interview. The reverse side of the N-405 form contains the oath of allegiance that is administered to new citizens. The officer typically would go through the oath with the applicant to determine if he had any objections to its terms. The evidence showed that the applicant typically would sign the oath at the time of the INS interview. The reverse of the form also contains the following statement: "Petition granted and Certificate No. _____ issued."

At the conclusion of the interview, the officer would grant the application if the applicant met all the requirements for naturalization or would deny the application if the

applicant could not meet the requirements.  If more information was required or if there was a correctable deficiency, the officer would "continue" the application.  The examiner's action would be noted on the application with a "C" (continued), "D" (denied), or "G" (granted).  The officer would also fill out a worksheet stating her conclusion and identifying any deficiencies in the application.  If there was a deficiency in the application that could be overcome, the examiner would schedule a follow-up interview.

Upon the INS officer's approval of an N-400 application, the applicant would be directed to file the N-405 petition for naturalization with the district court clerk, which in 1988 was located in the same building as the Chicago INS office.  The evidence also showed that if the applicant was deficient in some way that the examiner believed was likely to be corrected, the examiner had the discretion to have the applicant go ahead and file the N-405 with the court clerk and pay the filing fee.

The officer would give the applicant the N-405 form in an envelope and direct the applicant to the district court clerk's office, where the applicant would submit the application and pay the fee.  A deputy clerk – who would have no information distinguishing whether the INS had already approved the applicant or instead had continued his application – would sign a certification (located in the lower right corner of the front of the N-405 form) stating that the petition had been filed, and would stamp the name and title of the clerk of court in the certification section as well as a "petition number" in the upper right corner of the form.  The clerk would also assign the applicant a naturalization certificate number and note this in a blank on the reverse side of the

form, immediately below the petitioner's signed oath of allegiance.

The clerk would then transmit the completed N-405 form back to the INS, where it would be placed in the applicant's file. If the INS had granted the application, it would schedule and notify the applicant of the date and time of a final "hearing" in court, at which a judge would grant the petition for naturalization. If INS had continued the application, it would schedule a follow-up interview and notify the applicant.

Naturalization ceremonies, then as now, were typically conducted in the ceremonial courtroom in the Dirksen Courthouse, with a district judge presiding. Prior to each ceremony, the INS would prepare a court order listing the persons whose petitions it recommended the court to grant, as well as a naturalization certificate for each such person. The applicant / petitioner would be advised in writing to appear for a ceremony. A judge would grant the petitions of those in attendance and would administer the oath of allegiance. Following the conclusion of the ceremony, the draft court order would be signed and filed, and the naturalization certificates would be distributed.

**2.   Ayesh's application for naturalization**

Ayesh was born in Jerusalem on May 5, 1961, prior to Israel's occupation of the West Bank region. In 1982, he came to the United States and obtained permanent resident status. In 1986, Ayesh submitted an application for naturalization but was turned down because he had not yet been in this country long enough. Ayesh submitted a new application in 1987. On March 2, 1988, Paula Price, an INS officer, interviewed Ayesh at the Chicago INS office. This, the Court finds, was the first of two

interviews that Ayesh attended. The Court bases its findings regarding what happened at those interviews not just on the testimony of Ayesh and Price (the second interviewer did not testify), but also on the documentary evidence, specifically, the originals of Ayesh's N-400 and N-405 forms, which contained different colors of ink, and the worksheets prepared by the officers contemporaneously with or just after the interviews.

At the outset of the March 2 interview, Price administered to Ayesh an oath to tell the truth. Price then reviewed Ayesh's N-400 application with him, asking specific questions and making notations in red ink. Among other things, Price inquired whether Ayesh had been arrested for or convicted of a crime. On the N-400 form, Ayesh had answered those questions in the negative. During the interview, Ayesh disclosed a 1985 arrest, which Price noted on the N-400 form in red ink. Ayesh had also been arrested in Texas in June 1987 for possession of a controlled substance, but he did not disclose that arrest at the interview. That charge was still pending at the time of the interview, and Ayesh was convicted of the charge later in March 1988.

Ayesh had also stated on the N-400 form that he had not registered for Selective Service, but the documents do not reflect that Price noted this as a deficiency. At the time, the law required males from ages 18 through 26 to register for Selective Service. At the time of his March 2, 1988 interview, Ayesh was just two months short of his 27th birthday. He testified that he had registered for Selective Service, but that testimony is uncorroborated, and the Court found it unpersuasive. That said, the Court is persuaded (though there was contradictory testimony) that at the time, it was common in cases involving persons like Ayesh who were about to "age out" of the registration requirement

7

for the officer to make inquiry regarding whether the applicant had willfully failed to register, and if not, to bypass this requirement rather than using it to disqualify the applicant. That, the Court is persuaded, is how Price viewed the matter at the time. For this reason, she did not identify the Selective Service issue as a deficiency on the N-405 form or on her worksheet.

Price also administered the "government test" to Ayesh. She noted on her worksheet that Ayesh did not pass the test. Price also had Ayesh write two sentences in English on the N-400 form. In addition, she reviewed with Ayesh the oath of allegiance, as printed on the N-405 form, and she likely had him recite the oath out loud.

Ayesh testified that after Price administered the government test and had him write out two sentences in English, she told him, "Congratulations, you passed." He testified that Price then called in two other officers, administered the oath of allegiance, and told him, "Congratulations, you are a citizen of the United States." She then had him sign a document and sent him to the clerk's office to pay a fee. As noted earlier, the Court does not doubt that Price had him recite the oath of allegiance. The Court does not find credible, however, Ayesh's testimony that Price told him he had passed the government test or that she told him he had become a citizen. This testimony cannot be reconciled with the contemporaneous documentary record of Ayesh's interviews, which reflect that he did not pass the government test at his interview with Price and that he returned in late May 1988 for a second interview. And though the Court found persuasive Ayesh's testimony that Price had him recite the oath of

8

allegiance, she likely did so to test his English comprehension skills and to confirm that he had no problem with the contents of the oath, because she expected that Ayesh ultimately would meet the requirements for citizenship. Ayesh testified that this was the only time that the oath of allegiance was administered to him; he never took the oath in a courtroom or before a judge.

The back of the N-400 form provides a space for the immigration officer to make notations and state her conclusions. Price documented several points on the back of Ayesh's N-400 form. She noted that she had sent Ayesh's fingerprint card to be checked. (This provides further confirmation that Ayesh was not approved for citizenship that day, nor could he have been.) Price also noted that she had not reviewed Ayesh's immigration file – referred to as an "A file." She also indicated that Ayesh would have to pay the filing fee to the clerk of court. In the space on the N-405 form for stating her recommendation, Price wrote "C," indicating that Ayesh's application was continued to a later date.

On May 31, 1988, Ayesh returned to the Chicago INS office for a second interview. On this occasion, he was interviewed by immigration officer Gerald Solberg. The fact of this interview is clearly documented via Solberg's notations on the back of Ayesh's N-400 form and on a worksheet Solberg prepared at or after the interview. Solberg made notations in black ink on the N-400 form and his worksheet. The documentary record reflects that by the time of this interview the INS had located Ayesh's A file and that Ayesh passed the government test at the interview. It also appears that the INS had received the results of the fingerprint check.

Unlike Price, however, Solberg noted as a deficiency the absence of proof of Selective Service registration. For that reason, Solberg continued Ayesh's application. On the N-400 form, which Ayesh had filled out prior to the initial interview, Ayesh stated that he had not registered for Selective Service. At trial, Ayesh testified not only that he had registered but also that he had presented proof of his registration at his INS interview (the initial interview, the only one he recalled). During his testimony, however, Ayesh gave inconsistent dates regarding when he had registered: 1986, or between the two INS interviews. There was no evidence to corroborate Ayesh's contentions. As noted earlier, the Court did not find credible Ayesh's testimony that he had registered for Selective Service.

It does not appear that Ayesh disclosed at the May 31 interview that in late March, about four weeks after his 2 interview with Price, he had been convicted of possession of a controlled substance. The Court cannot say, however, that Ayesh concealed this; there is no evidence indicating that Solberg asked him anything about his criminal history or arrest record.

After the conclusion of the May 31 interview, Solberg directed Ayesh to take his N-405 petition to the district court clerk's office to pay the filing fee. This is shown by the fact that an employee of the clerk's office signed Ayesh's the N-405 form, stamped it with the clerk's name and title and a petition number, and inserted on the form the number of a naturalization certificate. Ayesh could not have done any of these things unless Solberg, the INS officer who conducted the May 31 interview, had given him the N-405 form and directed him to take it to the clerk's office. As indicated earlier, this

step typically took place only after the INS officer had verified that an applicant met all the requirements for naturalization or was reasonably certain that the applicant would be able to do so. The Court believes that the latter is the most likely explanation for the fact that Solberg permitted Ayesh to take his N-405 form to the clerk's office for filing.

It is clear that Ayesh filed the N-405 form and paid the fee after the May 31 interview, not after the March 2 interview with Price as he testified. The persons with naturalization certificate numbers consecutive to the one listed on Ayesh's N-405 form were shown to have appeared at the clerk's office on May 31.

It does not appear, however, that the INS ever scheduled a follow-up interview to determine if Ayesh had satisfied the Selective Service registration requirement. A worksheet in the file, dated July 27, 1990, appears to state that Ayesh should be called in for an interview for this purpose, but there is no indication that ever occurred. By the same token, however, there is no indication that the INS ever recommended denial of Ayesh's application.

There is no record that a date was ever set for Ayesh to appear at a naturalization ceremony. There is likewise no record that Ayesh ever received a certificate of naturalization, which is the official confirmation that a person has been naturalized. Ayesh concedes that he never appeared in court or before a judge for a naturalization ceremony.

In November 1992, Ayesh applied to replace his alien registration card – his "green card," in common parlance. On his application, Ayesh stated that his status was that of a permanent resident (there was, however, no box to check off for "citizen"

status – a citizen typically would have no need for a green card). When asked why, if he believed he was a citizen, he applied for a replacement green card, Ayesh said, "I need[ed] something to go with." The form reflects that an INS employee confirmed Ayesh's immigration status. It appears that the agency issued him a replacement green card.

As noted earlier, in 2001, DHS placed Ayesh in removal proceedings. Those proceedings appear to have been concluded in Ayesh's favor in 2004, for reasons the record does not disclose. In 2004, Ayesh applied for a U.S. passport. Passports are issued only to U.S. citizens. Ayesh included two letters with his application. The first was a May 24, 2004 a letter from USCIS, one of the agencies that succeeded the INS. The letter stated that USCIS's records reflected that Ayesh had been naturalized in Chicago on March 2, 1988 and had received a citizenship certificate. In the second letter, dated August 30, 2004, Ayesh described his naturalization application process, including a statement (consistent with his testimony at the trial) that he had been sworn in as a U.S. citizen on March 2, 1988. In September 2004, the Passport Office, an agency of the State Department, issued Ayesh a temporary passport valid for two years.

On December 16, 2004, however, USCIS sent a letter to the Passport Office stating that it had issued the May 24, 2004 letter in error. The letter stated that "[a] subsequent thorough review of [Ayesh's] immigration file reveals that it fails to contain evidence that Mr. Ayesh ever completed the naturalization process. Consequently, he is not a citizen of the United States." In a letter dated March 24, 2005, the Passport

Office informed Ayesh that it was revoking his U.S. passport.

The Department of Homeland Security then took steps to remove Ayesh from the United States based upon his criminal convictions and the contention that he had falsely used a passport or made a false claim to citizenship when coming into this country from Mexico in August 2006. On January 31, 2008, an immigration judge found that Ayesh was subject to removal due to his criminal convictions and ordered that he be deported to Israel. Ayesh appealed that decision to the Board of Immigration Appeals. That appeal was still pending at the time of the trial in the present case. As noted earlier, the BIA upheld the decision of the immigration judge shortly after the conclusion of the trial in the present case.

## Discussion

As of 1988, when Ayesh claims he became a citizen, the applicable statute provided that exclusive jurisdiction to naturalize persons as citizens rested with federal district courts and state and territorial courts of record. 8 U.S.C. § 1421(a) (1988). The same statute provided that "[a] person may be naturalized as a citizen of the United States in the manner and under the conditions prescribed in this subchapter, and not otherwise." *Id.* § 1421(d). No federal or state judge, however, approved Ayesh's petition for naturalization. Immigration officials in the executive branch of the government did not acquire the statutory authority to naturalize persons as citizens until October 1991. Ayesh does not contend that he became naturalized after that date.

In 1988, another provision of the immigration laws provided that "[e]very final hearing upon a petition for naturalization shall be had in open court before a judge or

13

judges thereof . . .," the only exception being if the petitioner was prevented by sickness or disability from appearing in open court.  8 U.S.C. § 1447(a) (1988).  Ayesh never appeared in open court or any other sort of public ceremony to take the oath of allegiance, nor does he contend that he was disabled from doing so.

It is true that Ayesh signed the oath of affirmation on his N-405 form, and the Court has likewise found that immigration officer Price had him recite the oath in her presence.  But that is insufficient.  Neither Price nor any other officer of the INS had the authority to act on behalf of the federal district court.  And in any event, a swearing-in by Price at the INS office – the only occasion when Ayesh claims to have been administered the oath of allegiance – does not constitute taking the oath in open court, as the law required in 1988.

In short, Ayesh did not satisfy the statutory requirements for naturalization as they existed in 1988.  As a result, he never became a citizen.  *See Sebastian-Soler v. U.S. Attorney General*, 409 F.3d 1280, 1284-85 (11th Cir. 2005).  Indeed, the evidence shows that Ayesh never successfully completed the naturalization process.  No officer of the INS recommended approval of his petition for naturalization.  Rather, at each of his interviews Ayesh was informed that more information was required before his application could be approved.

The only significant anomaly in this case lies in the events surrounding the Passport Office's issuance of a U.S. passport to Ayesh.  As the Court has recounted, Ayesh received a passport after the INS certified that he had been naturalized as a citizen.  The evidence is clear, however, that the certification was erroneous.  And

neither the INS's issuance of that certification nor the Passport Office's issuance of a passport is sufficient to confer citizenship on Ayesh. As far as the Court can determine, there is no such thing as citizenship by estoppel. *See INS v. Pangilinan*, 486 U.S. 875, 885 (1988) ("Neither by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means does a court have the power to confer citizenship in violation of [Congressional] limitations.").

There are several unfortunate aspects regarding the conduct of the government agencies in this case. The first is that it does not appear that the INS ever scheduled Ayesh for a follow-up interview – as it should have done – after his May 1988 interview with immigration officer Solberg. It is likewise unfortunate that USCIS incorrectly certified in 2004 that Ayesh was a citizen, as this likely led Ayesh to believe, as least for some period, that the matter was closed. And finally, it does not appear that the INS or its successor agency ever finally adjudicated Ayesh's application for naturalization. (Ayesh's intevening criminal conviction likely would have prevented him from succeeding on that application, however.) These events speak poorly of the INS and USCIS. They do not, however, entitle Ayesh to the relief he seeks from the Court in the present case.

## Conclusion

Because Ayesh has failed to show that he attained citizenship, each of his claims is lacking in merit. The Clerk is directed to enter judgment in favor of the respondents.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: December 14, 2009